# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

ALFY MAYES,
    Plaintiff,

CIVIL ACTION NO. _____

V.

GALVESTON COUNTY,
    Defendant.

## **PLAINTIFF, ALFY MAYES', ORIGINAL COMPLAINT**

This Complaint is filed Alfy Mayes, hereinafter sometimes referred to as Plaintiff, against Galveston County, hereinafter sometimes referred to as Defendant. Plaintiff asserts Defendant violated Plaintiff's rights under federal law, subjecting Plaintiff to disparate treatment, and retaliating against Plaintiff when Plaintiff complained of Defendant's unlawful employment practices. Plaintiff would show unto this Honorable Court as follows.

## **JURISDICTION AND VENUE**

1. Jurisdiction vests with this Court under 28 United States Code § 1331 (federal question); § 1343 (civil rights); and Title VII of the Civil Rights Act of 1964 (as codified, 42 U.S.C. §§ 2000e-2000e-17).

2. Federal law is clear, it is illegal to "fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or […] to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." (Title VII, 42 U.S.C. 2000(e)-2).

3. Plaintiff is a member of a protected class (race).

4. Federal law prohibits discrimination against any employee or applicant because said employee or applicant has engaged in protected activity (for example, because he has "opposed any practice made an unlawful employment practice […] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. 2000e-3(a)).

5. Venue lies with this Court; all material matters occurred in Galveston County, Texas.

6. Plaintiff has exhausted his administrative remedies.

**I. PARTIES**

7. Plaintiff is a resident of Galveston County, Texas.

8. Plaintiff has been employed as an officer with the Galveston County Sheriff's Office at all times material to this action.

9. The Galveston County Sheriff's Office is an arm of Galveston County.

10. At all times material to this action, Galveston County was the employer, as that term

is defined by law.

## II. PREVIOUS LAWSUIT

11. Plaintiff filed suit against Defendant in this Court, on or about July 22, 2021, complaining of unlawful discrimination based on race, and also complaining of retaliation, in violation of Title VII.

12. On or about November 22, 2023, this Court granted summary judgment.

13. Plaintiff proceeded before this Court *pro se* in that case until a few months prior to the November 22, 2023 final judgment.

14. Plaintiff filed and prosecuted his claims in that suit in good faith.

15. On or about October 7, 2022, Plaintiff went back to the EEOC, complaining of discrimination and retaliation occurring after Plaintiff filed suit in July 2021.

## III. FACTUAL COMPLAINT

### A. Background Information[1]

16. Plaintiff, who served in the United States Armed Forces (Marine Corps), and is a veteran of Operation Desert Storm, has been employed with the Galveston County Sheriff's Department for over thirteen (13) years.

17. GCSO's chief administrative offices are: Chief Deputy of the Law Enforcement

---

[1] Generally, acts occurring more than 180 days prior to filing a complaint with the EEOC, although having no present legal consequences, "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Air Lines v. Evans*, 431 U.S. 553 (1997).
Acts outside of the 180-day period may be considered as a "continuing violation" in certain cases, when they involve the same type of discrimination; are recurring; and have a "degree of permanence." *Berry v. Board of Supervisors*, 715 F. 2d 971 (5th Cir. 1983), *on appeal following remand*, 783 F. 2d 1270 (5th Cir. 1986).

Bureau; Chief Deputy of the Corrections Bureau; Criminal Law Commander; Support Services Commander; Corrections Bureau Commander; and Reserve Bureau Commander.

18. Five of six of these offices are held by White Males.[2]

19. The overwhelming majority of GCSO officers holding the position of "Sergeant Sheriff I" and higher are White.

20. There are approximately four hundred and eighty (480) officers working for GCSO.

21. Of this number, approximately ninety-three (93) are Hispanic, and seventy-eight (78) are Black/African American.

22. Throughout Plaintiff's time with the Galveston County Sheriff's Office ("GCSO"), he has both observed and experienced discrimination based on race.

23. Plaintiff's employer has a history of retaliating against Plaintiff for engaging in protected activity.

24. Beginning in 2019, Plaintiff submitted three (3) complaints of discrimination, harassment, and hostile work environment claims to the Galveston County Sheriff's Human Resources Department.

25. On June 24, 2020, Plaintiff met with the Sheriff, Henry Trechosset, regarding the complaints and the conditions of his employment.

26. Plaintiff was immediately subject to retaliation on the basis of his having engaged in protected activity (complaining as to the conditions of his employment).

---

[2] https://www.galvestoncountytx.gov/our-county/sheriff/sheriff-s-office-administration (last visited January 10, 2024): Dennis Macik; Douglas Hudson; Ray Nolen; Ronald Hill; Kevin Walker; and Jack Walker hold these offices. Kevin Walker is an African-American Male. The remaining officers are White Males.

27. Plaintiff began receiving disciplinary write-ups for incidents which were common practice; and/or for which fellow Caucasian officers were not subject to being written up.

28. The seriousness of the disciplinary write-ups escalated after Plaintiff filed suit against Defendants; Defendants were served with the lawsuit in November 2021.

29. During the years 2013 and 2014, Plaintiff held an administrative position, which he enjoyed and dispatched with skill.

30. The administrative position held by Plaintiff was generally sought-after to a greater degree than were positions at the jail, given the unique stressors associated with the latter positions.

31. Regardless, individual officers/employees should not have been permitted to choose from, or apply for, positions which were already filled; which were not available; and which were not coming available.

32. However, on several occasions during the 2013-2014 time period, GCSO removed Plaintiff from the administrative position, placing him at the jail, and replacing him with either White or Hispanic employees.

33. Prior to transferring out of the administrative role to the jail, Plaintiff would be tasked with training his replacements.

34. When Plaintiff's first replacement, a White Female named Sue Ellen Snipes, took ill and passed away, Plaintiff was asked to come back to the administrative position and take over his regular duties as before.

35. Shortly after Plaintiff came back to the administrative position, a Lieutenant Joseph

Gregory began regularly berating Plaintiff, telling him "you're going back to the jail," or asking "you know you're going back to the jail, don't you?"

36. Two or three months after coming back to the position, Plaintiff did indeed get transferred back to the jail; the administrative position was then filled by Mr. Don Roy, a White Male with two sons on the GCSO force.

37. Mr. Roy was transferred out of the position a few months later, and Plaintiff was asked to come back and clean up the problems that had accrued during Plaintiff's absence from the position.

38. GCSO kept Plaintiff in the position long enough to get the administrative system back on track; GCSO then replaced Plaintiff, again, with Mr. Charles Gonzales.

39. Plaintiff was written up for providing sodas to his work crew, bypassing the pay function to provide two (2) sodas for his four (4) crew members to share.

40. Plaintiff had been shown the bypass function by a fellow Caucasian officer, who engaged in the practice for the same reason (providing necessary refreshments for members of work crews). Plaintiff had utilized the function due to the lack of resources for the crew he was working with; they did not have a break room or access to refreshments, unlike many other crew members.

41. No Caucasian officers were written up for engaging in this common practice.

42. In 2014, Plaintiff applied for a sergeant position.

43. Plaintiff did not make it to the second round of interviews for the sergeant position.

44. None of the Black/African American applicants for the sergeant position in 2014 (one was already a Corporal) made it to the second round of interviews.

45. Based on experiences like these, Plaintiff, and other African American GCSO employees/deputies, often decline to apply for open Sergeant or promotional positions, knowing that the chances of being considered for hire are slim or nonexistent.

46. During Plaintiff's employment with GCSO, Black/African American employees have resigned, rather than continue to deal with the persistent racism, which is sometimes overt but is consistently systemic.

47. Plaintiff was an officer with Galveston County's Veteran's Court, and was a member of the Honor Guard, until 2017.

48. At the time, Colin Kaepernick, a professional football player, was in the news for first sitting, and then kneeling, during the national anthem, in symbolic protest against racial injustice, police brutality, and oppression. During the 2016-2017 football season, at the beginning of a session of Veteran's Court, County Judge Mark Henry made derogatory remarks about Colin Kaepernick and those who take a knee during the national anthem.

49. Plaintiff spoke up in response to the County Judge on this matter of public concern, because it was also an issue personal to Plaintiff, as an African-American male, as a patriot, as a veteran, and as a law enforcement officer.

50. Plaintiff spoke up, respectfully, informing the judge "I do not totally agree with what you said. It's about our people being killed unjustly in the street, and nothing being done about it. You can't say we are not loyal to our country. We have fought in every war. I was in Desert Storm. We are still in the military." Plaintiff also mentioned the fact

that retired Army Green Beret Nate Boyer, a White Male, had convinced Kaepernick to take a knee, rather than sit, during the national anthem.[3]

51. Immediately after making these remarks, Plaintiff was summarily stripped of his responsibilities and removed from the Veteran's Court and the Honor Guard.

52. Plaintiff did not address this issue at the time; Plaintiff was unclear as to whether the removal of his position was based on race or on his First Amendment-protected activity, speaking on a matter of public concern.

53. At some time thereafter, Plaintiff made Facebook posts addressing and discussing the brutal history of lynchings of African-Americans in the United States. Three ranking officers, who saw Plaintiff's posts, called Plaintiff a "racist."

54. In 2018, Plaintiff was written up for allegedly having clocked in incorrectly, which was the result of a malfunctioning time clock. A fellow African-American officer was also written up for the same reason (stated to have clocked in incorrectly, although the malfunctioning time clock created the problem). Caucasian/white officers did not receive any such write-ups. Plaintiff contacted the IT Department in an attempt to resolve the issue. Plaintiff was called into the office of a superior officer and verbally reprimanded for having done so: "if you call IT again we are going to have problems."

55. Plaintiff subsequently received disciplinary write-ups for instances which, absent a retaliatory motive, would not have been subject to any such action.

---

[3] As a point of clarification, Veteran's Court tends to be slightly less formal than the "typical" courtroom atmosphere; Plaintiff Mayes' comments were not out of order. It was the substance of the statements, not the interjection, that was problematic for Defendant.

56. On or about March 15, 2019, Plaintiff reported that he was being harassed at work, in violation of law and written policy.

57. On or about July 10, 2019, Plaintiff filed a subsequent written complaint, noting that then-Captain (now Major) Kevin Walker had informed Plaintiff "you can appeal all the way up to the Sheriff, but nothing will be done about it."

58. Plaintiff subsequently began receiving retaliatory write-ups, based upon factual accounts that were either untrue, or were so minor or insignificant that they would not have resulted in a disciplinary write-up, absent retaliation. These included the following:

   a. On September 13, 2019, Plaintiff was cited by Sergeant Warfield for failure to conduct rounds in a timely manner. Plaintiff had not committed the cited offense. The technology used for tracking rounds was new; Plaintiff was unfamiliar with it, and had not been adequately instructed as to how to use it; as a result, Plaintiff's rounds, although compliant, were not properly recorded. This fact was known to Plaintiff's supervision.

   b. On October 3, 2019, Sergeant Warfield cited Plaintiff, based on incorrect/untrue statements about Plaintiff's activities in the Dayroom.

   c. From November 1-3, 2019, Plaintiff was subject to retaliatory action in context of assignment of mandatory overtime. The selection process for mandatory overtime generally goes by a seniority list generated by date of hire. Plaintiff had been working with GCSO for ten years, and should not have been selected.

d. On November 4, 2019, Plaintiff received a disciplinary citation, for arriving to work between one (1) and two (2) minutes late.

e. On December 30, 2019, Plaintiff received a disciplinary citation, for arriving to work between one (1) and two (2) minutes late.

f. On January 3, 2020, Plaintiff received a disciplinary citation with respect to hairclipper guards (failure to obey orders).

g. On January 19, 2020, Plaintiff received a disciplinary write up because the multi-purpose room door was cracked open.

h. On February 25, 2020, Plaintiff was cited by Sergeant Warfield, because an inmate exercising in the yard accidentally cut himself with metal from an arm band. Sergeant Warfield had not been present or involved at the time. The incident had occurred while two inmates were "shadow boxing" as a physical activity (not fighting). Medical staff attended to the inmate's cut. Plaintiff's supervision wanted Plaintiff to write a report stating the inmates had been fighting, which would have been untrue.

i. On May 27, 2020, Plaintiff was cited by Sergeant Warfield for "neglect of duty" regarding a fight between inmates. Warfield reported the incident incorrectly. The incident involved an inmate who was not showering, which had resulted in complaints by other inmates. During Plaintiff's shift, at the time for the inmates' bed roll exchange, Plaintiff called all inmates in from the recreation yard. Given Plaintiff's knowledge that inmates in this pod were generally well-behaved, Plaintiff did not immediately lock the door to the

recreation yard. Almost everyone got in line, but the inmate who had not been showering went into the recreation yard. Plaintiff subsequently took that inmate outside of the pod to discuss hygiene issues and alternatives to showering, encouraging the inmate to ease his relationship with other inmates. During the one-on-one conversation, the inmate reported that when he had gone back out into the recreation yard, another inmate had come out and assaulted him. Plaintiff contacted Sergeant Warfield and Jarma to tell them about it. Sergeant Warfield subsequently wrote Plaintiff up for the incident.

j. On September 12, 2020, Plaintiff was cited by Sergeant Jarma for failure to prepare reports.

k. On September 17, 2020, Plaintiff was cited for Neglect of Duty for discussing the bible with an inmate. Said inmate had requested a bible, and asked Plaintiff some questions; Plaintiff engaged in a discussion with the inmate; this was observed via video recording, and Plaintiff received a disciplinary citation.

l. On October 10, 2020, Plaintiff received a disciplinary citation for being between one (1) and four (4) minutes late to work.

m. On October 14, 2020, Plaintiff received a disciplinary citation for being between one (1) and four (4) minutes late to work.

n. On October 14, 2020, Plaintiff received a disciplinary citation for failure to file reports.

o. As to the above-listed citations (October 14, 2020), Lieutenant Denise Elizondo made statements to Plaintiff, similar to those previously made by Walker, stating – "I know you've gone to the Sheriff before, you can go to him again if you like." The write-ups were later ruled unfounded and removed from Plaintiff's file.

p. On November 4, 2020, Plaintiff was cited with neglect of duty, because, after all inmates had been fed, Plaintiff allowed some inmates to have second portions.

q. On December 14, 2020, Plaintiff was received a disciplinary citation for violation of policy/procedure (inmates standing on the red line by an officer's desk).

59. On Wednesday, January 20, 2021, Plaintiff had taken his daughter (who, although an adult, is disabled and requires full-time care, due to a near-fatal car accident twenty years ago) to a doctor's appointment. Plaintiff had informed GCSO in advance, and had provided an estimated return time.

60. Due to scheduling delays/traffic, Plaintiff was running slightly later than his estimated time of return on the way back from the doctor's appointment. Sergeant Warfield contacted Plaintiff on Plaintiff's cell phone, expressing that he (Warfield) was upset with Plaintiff, because Plaintiff had not arrived at work yet and Warfield had to "hunt [him] down."

61. Warfield, as well as other supervising officers, had been targeting Plaintiff for disciplinary write-ups for some time prior to this conversation.

62. Warfield had instructed employees/officers under him that they had to issue disciplinary write-ups to the Plaintiff, and if they did not, they would face disciplinary actions themselves.

63. Plaintiff became angry during the telephone conversation, informing Warfield that he did not appreciate Warfield's disrespectful, derogatory and unprofessional comments.

64. It was subsequently recommended that Plaintiff take the day off; Plaintiff did so.

65. Plaintiff was subsequently instructed to take the rest of the week off.

66. Plaintiff returned to work the following Monday, January 25, 2021; Plaintiff was immediately instructed to go home, and not to return until further notice.

67. Plaintiff was docked for two (2) days of sick leave for Monday and Tuesday, January 25 and 26, 2021.

68. Plaintiff was required to be cleared by a psychologist before coming back to work. Plaintiff saw the psychologist and was cleared on January 29, 2021.

69. On February 12, 2021, Sergeant Jarma issued a disciplinary citation to Plaintiff for failure to timely conduct rounds, based upon information Sergeant Jarma obtained from the Guard Plus round tracker.

**B. Facts giving rise to the instant complaint**

70. Plaintiff was written up in 2021 for improper use of force during an incident in August 2021.

71. Plaintiff had followed policy and procedure in de-escalating a situation with an Inmate, and had actually been commended on his proper use of force by superior officers on the day of the incident for which he was subsequently disciplined.

72. As a result of the unjustified complaint of use of force, Plaintiff was effectively demoted.

73. With respect to use of force, Caucasian officers were treated much differently; Officer Jonathan Wuneberger, for example, was written up multiple times over several years for excessive force, but was not terminated until his excessive use of force resulted in an individual's death: shoving an inmate, held on a charge of trespassing, into a cell, with such force that it caused the inmate to hit his head and ultimately die.[4]

74. On January 11, 2022, Plaintiff was written up for an alleged incident with an inmate, which had occurred on December 19, 2021. The inmate, possibly seeking attention, had ripped up some material found in his cell and draped it around himself. While handing the inmate a meal tray at 11:20 p.m., Plaintiff noted the inmate had draped the cloth around his neck "much like a scarf." The inmate was not in danger from the draped cloth; his movement was not restricted; and he was breathing and speaking freely.

75. Rather than neglect the other inmates in the pod, all of whom were awaiting their meals at the time, Mayes delivered the meals, keeping watch on the inmate and checking on him five minutes later, at 11:25 p.m.

76. At 11:30 p.m., five minutes after checking on the inmate a second time, Plaintiff made a non-emergency call, requesting assistance in removing the torn material from the inmate's cell; Sergeant Jarma and Prevost responded at 11:31 p.m.

---

[4] Matt Degrood, John Wayne Ferguson, Indicted Former Galveston deputy had history of excessive force before inmate's death, lawsuit says. Houston Chronicle, December 17, 2022. https://www.houstonchronicle.com/news/houston-texas/galveston/article/lawsuit-galveston-deputy-excessive-force-17658386.php (visited January 10, 2024).

77. Within an hour of the incident, at 12:26 on December 19, Jarma reported that the inmate "had the [] material wrapped around his neck multiple times **like a scarf**. **There was no kno**t. The insulation material was cut with my county issued scissors. Inmate [] attempted to resist myself and Deputy Prevost. Inmate [] also attempted to act erratic while medical was conducting their evaluation ending with them saying he was fine." (emphasis added.).

78. Shortly thereafter, Sergeant Jarma reported he had been informed by CID that "the [d]estroyed smock could be thrown away seeing as there is no [k]not, no crime, and nothing to preserve." (*id.*). There were no marks on the inmate.

79. Both Plaintiff and Sergeant Jarma reported that the material was draped around the inmate, not tied or fastened in any way indicative of intent to self-harm. There is no evidence of the inmate being on suicide watch or making any statements giving rise to cause for increased caution.

80. Plaintiff was not informed of a disciplinary investigation until weeks later. Plaintiff was cited for "neglect of duty," but according to all reports, Mayes conducted frequent rounds, passed out meals to inmates, and requested assistance with the inmate who was ripping up material.

81. The complaint against Plaintiff was instituted by Sergeant Jarma. Sergeant Jarma had previously made crudely racist comments in Plaintiff's presence on multiple occasions, referring to white women who date black men as "snicker licker[s]." Plaintiff is African-American; Plaintiff's wife is Caucasian.

82. As a result of the disciplinary investigation instituted by Sergeant Jarma surrounding

the December 19, 2021 incident, Plaintiff was disciplined by suspension without pay.

83. On January 11, 2022, Plaintiff was working with a White male officer, Connor Dunn. During the shift, a young inmate, after being verbally told to go back to his cell, refused to do so, instead going up to the second floor. The inmate in question was in handcuffs, and remained handcuffed throughout the entire incident which followed.

84. Because GCSO policy states officers are to call for backup if they have time to do so, as it lessens the possibility of anyone getting hurt, Plaintiff immediately called for backup when the inmate walked upstairs. Instead of waiting for backup, Dunn went upstairs after the inmate.

85. Video of the incident showed Officer Dunn on the second floor, holding his arms out to the sides, while the inmate shuffled back and forth, laughing. There was no confrontation between Dunn and the inmate at that time; there were no raised voices.

86. Dunn then stepped to the side, letting the inmate walk by. Dunn followed behind the inmate. Dunn appeared relaxed during this encounter; Dunn's hands were in his pockets as he followed the inmate.

87. Dunn eventually held his arms out to the sides again, at which point the inmate ran under one of Dunn's arms. Dunn grabbed the inmate around the waist, and the inmate held on to the stairwell.

88. There were no raised voices during the interaction; Dunn did not call to Plaintiff for assistance.

89. Backup officers arrived within one minute of Plaintiff's having called for backup, and assisted in placing the inmate back into his cell.

90. The entire incident took approximately one and a half minutes.

91. Neither the inmate nor Officer Dunn was in any danger at any time during the incident.

92. Dunn violated policy by failing to call for backup.

93. Dunn was not subject to any disciplinary action as a result of the incident.

94. Plaintiff followed policy, by calling backup.

95. Plaintiff was written up for cowardice; given a 90-day probation and a six-day suspension, in response to the disciplinary investigation launched regarding the incident with Dunn and the inmate. Plaintiff was also required to re-take the jailer's class, something required of new and inexperienced officers.

96. Both the December 19, 2021 incident and the January 11, 2022 incident resulted in AAR reports – the only such reports of Plaintiff's career.

97. In April 2022, Plaintiff was recommended for termination.

98. On October 7, 2022, Plaintiff submitted his charge of discrimination to the EEOC, alleging unlawful discrimination and retaliation.

99. The EEOC issued a Right to Sue letter on October 12, 2023.

100. Plaintiff received notice of the Right to Sue letter on or about October 19, 2023.

### IV. DISPARATE TREATMENT

101. Plaintiff was disciplined and ultimately recommended for termination, allegedly for improper use of force, for an incident in which Plaintiff followed policy and procedure and used force appropriately.

102. White officers employing force were treated more favorably (*see,* e.g., footnote 4,

*supra*).

103. Plaintiff was harshly punished for an incident in which Plaintiff had followed protocol, policy and procedure.

104. The other officer involved in the incident (Dunn) had *not* followed protocol, policy and procedure, but was treated much more favorably than Plaintiff. No disciplinary investigation ensued as to Dunn's actions.

## V. RETALIATION

105. Plaintiff engaged in protected activity when he filed suit against his employer in July 2021.

106. Defendant retaliated against Plaintiff by investigating and disciplining Plaintiff for Plaintiff's use of force, occurring in or around August 2021.

107. Defendant retaliated against Plaintiff by investigating and disciplining Plaintiff for the incident occurring on or about December 19, 2021.

108. Defendant retaliated against Plaintiff by investigating and disciplining Plaintiff for the incident which occurred on or about January 11, 2022.

## VI. PRAYER FOR RELIEF

Plaintiff prays for the following relief:

109. Declaratory judgment stating that the Defendant has engaged in unlawfully discriminatory conduct;

110. Declaratory judgment stating that the Defendant has have engaged in unlawful retaliatory conduct;

111. Back wages and benefits;

112. Future wages and benefits;

113. Compensatory damages for harm incurred in the past, present and future;

114. Medical bills in the past, present and future;

115. Reasonable and necessary attorney's fees, when Plaintiff is the prevailing party;

116. Pre-judgment and post-judgment interest;

117. Costs of court;

118. Plaintiff further prays for all relief in equity and under law to which he may be deemed entitled.

DATE: January 10, 2024.

Respectfully submitted,

/s/ *Ellyn J. Clevenger*
Ellyn J. Clevenger
Attorney-In-Charge
Federal I.D. No. 3597745
State Bar No. 24058662
1115 Moody Avenue
Galveston, Texas 77550
409.621.6440

ATTORNEY FOR PLAINTIFF
   ALFY LEVINE MAYES

A JURY TRIAL IS DEMANDED